IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALYSON DIANE HOYLE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-3464 |
| | § | |
| CAROLYN W. COLVIN,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION**</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross-Motion for Summary Judgment (Doc. 9). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docs. 5, 7, 8.

disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act").

## A.  Medical History

Plaintiff was born on September 9, 1964, and was forty-five years old on June 8, 2010, the alleged disability onset date.[3] Plaintiff obtained a high school diploma, completed one semester of college, and worked as a billing clerk for Trophy Nissan until June 8, 2010.[4]  Plaintiff's prior relevant work experience included employment as a billing clerk for Greenville Pontiac Buick GMC and Chastang Enterprises, a finance manager for Limon Chrysler Plymouth, and a claims clerk and warranty administrator for Perkins Motor Company.[5]

### 1.  Physical History

Prior to 2010,[6] Plaintiff had been diagnosed with: psoriatic arthritis with aspects of undifferentiated spondyloarthropathy, lumbar type; iron-deficiency anemia; hypertension; recurring

---

[3]    See Tr. of the Admin. Proceedings ("Tr.") 10, 16, 17, 18, 132-39, 149, 153.

[4]    See Tr. 31, 46, 140-46, 154 160, 300.

[5]    See Tr. 30-32, 46, 140-46, 154, 160-67.

[6]    The court notes that the record contains many treatment notes from prior to the alleged onset date and from after the decision of the Administrative Law Judge.  The only records that are important to the court's review are those that inform the court of Plaintiff's condition between the alleged onset date (June 8, 2010) and the date of the ALJ's decision (May 11, 2011).  For this reason, the court discusses the relevant treatment notes for appointments and test results for the period May 13, 2010, to August 8, 2011.

Epstein-Barr syndrome; sleep apnea; and depression.[7] Plaintiff continued to receive medical treatment for those conditions in 2010.[8]

A few weeks prior to the alleged onset date, Les T. Sandknop, D.O., ("Dr. Sandknop") noted on laboratory results from specimens collected on May 13, 2010, "All [g]ood except at end of E.V.B. [sic]."[9] The latter portion of his note apparently referred to the Epstein-Barr Virus Panel.[10]

In a letter addressed to "To Whom it may concern" dated June 8, 2010, Dr. Sandknop wrote that he was Plaintiff's treating physician for psoriatic arthritis, iron-deficiency anemia, and hypertension and that Plaintiff was under the care of a rheumotologist.[11] Dr. Sandknop explained that Plaintiff's diseases affected "her ability to function in a normal capacity" and opined that "[s]ome days can be worse than others."[12] He concluded that Plaintiff was unable to work at that time.[13] Dr. Sandknop apparently did not see Plaintiff on that day, as he did not write

---

[7]    See Tr. 68, 132, 134, 153, 156-59, 168, 300, 303-04, 308, 317-20, 327, 329, 332, 519, 529, 549-54.

[8]    See id.

[9]    Tr. 392.

[10]    See Tr. 392-93.

[11]    See Tr. 332.

[12]    Id.

[13]    See id.

3

a treatment note.

On October 27, 2010, Dr. Sandknop completed a Multiple Impairment Questionnaire ("MIQ") and indicated that, since March 2005, he had been treating Plaintiff almost every month, but certainly once every six months for blood tests.[14]  Dr. Sandknop reported that Plaintiff's most recent appointment was in May 2010, over five months before Dr. Sandknop completed the MIQ.[15]  He indicated that all of Plaintiff's symptoms and limitations had been present since March 2005.[16]

In the MIQ, Dr. Sandknop stated Plaintiff's prognosis was poor as a result of her diagnoses of degenerative disc disease of the lumbar spine, psoriatic arthritis, anemia, and cardio-vascular disease.[17]  He pointed to a pelvic ultrasound, magnetic resonance images (MRIs) of the lumbar spine, cervical spine, and brain, a renal scan, a lower extremity arterial doppler ultrasound, and blood tests as the medical testing in support of the diagnoses.[18] Dr. Sandknop described Plaintiff's pain and fatigue as moderately severe and reported that he was unable to relieve her pain through

---

[14]     See Tr. 350-57.

[15]     Tr. 350, 357; see also Tr. 227, 359.

[16]     Tr. 356 (answering March 2005 to the question, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?").

[17]     See Tr. 350.

[18]     Tr. 350-351.

medication without unacceptable side effects.[19]  In response to a question asking for a list of the patient's medications and side effects, the doctor listed eight medications, including Enbrel and Methotrexate,[20] and one vitamin supplement; the only side effect noted was "extreme fatigue" in connection with Enbrel injections.[21]

Regarding Plaintiff's residual functional capacity ("RFC"), Dr. Sandknop opined that Plaintiff could sit for a total of no more than one hour in an eight-hour workday, could stand/walk for a total of no more than one hour in an eight-hour workday, and would need to have the option of moving around with some frequency as dictated by pain.[22]  He indicated that Plaintiff was incapable of lifting or carrying any weight at all and was incapable of pulling, pushing, kneeling, bending, or stooping.[23]  Dr. Sandknop rated Plaintiff's degree of limitation with regard to grasping, turning, and twisting objects and using her fingers/hands for fine manipulations as moderate (significantly limited but not completely precluded) and rated her degree of limitation with regard to using her arms for reaching as marked (essentially precluded).[24]  Further,

---

[19]    Tr. 352.

[20]    Enbrel and Methotrexate are used in combination to treat arthritis. See WebMD, http://www.webmd.com/drugs/drug-16772-Enbrel+SubQ.aspx?drugid=16772& drugname=Enbrel+SubQ&source=3 (last visited July 8, 2013).

[21]    See Tr. 354.

[22]    Tr. 352.

[23]    Tr. 356.

[24]    Tr. 353-54.

he indicated that she should avoid dust, heights, temperature extremes, fumes, noise, and gases.[25]  Dr. Sandknop opined that Plaintiff was incapable of performing a full-time, competitive job that required sustained activity, that she could not tolerate any stress, and that she was not capable of working eight-hour days.[26]

Lab tests dated the same date that Dr. Sandknop completed the MIQ (October 27, 2010) revealed all areas measured to be within the normal range except for mean corpuscular volume and mean corpuscular hemoglobin, which were both slightly higher than the reference range.[27]  Dr. Sandknop did not enter a treatment note for that day, suggesting that he did not actually see Plaintiff.

On December 27, 2010, Plaintiff returned to Dr. Sandknop for a check-up, complaining of a possible bladder infection, and for prescription refills.[28]  Plaintiff reported that she was "doing well" and mentioned nothing about experiencing side effects.[29]  As part of the treatment plan, Dr. Sandknop noted that Plaintiff should see a rheumatologist.[30]

Plaintiff later met with her treating rheumatologist, Pooja

---

[25]    Tr. 356.

[26]    Tr. 355.

[27]    See Tr. 386-87.

[28]    See Tr. 358.

[29]    Id.

[30]    See id.

6

Banerjee, M.D., ("Dr. Banerjee"), on March 3, 2011.[31]  During that appointment, Dr. Banerjee noted Plaintiff's complaints of diffuse aches and pains and the existence of psoriatic plaques[32] in her hairline and on the distal arm.[33]  Dr. Banerjee diagnosed Plaintiff with psoriatic arthritis with psoriasis and obstructive sleep apnea.[34]  Dr. Banerjee recommended Plaintiff continue taking Enbrel and Methotrexate.[35]

On July 22, 2011, Dr. Banerjee completed an Arthritis Impairment Questionnaire.[36]  Dr. Banerjee stated that she was treating Plaintiff for psoriatic arthritis with features of undifferentiated spondyloarthropathy, lumbar type, and indicated that Plaintiff's most recent appointment had been in March 2011.[37] From the form's list of eighteen clinical findings related to arthritis, the doctor indicated only that Plaintiff suffered muscle weakness, bilateral reduced grip strength, and sensory loss (blurred vision).  Dr. Banerjee noted that a joint scan showed

---

[31]  See Tr. 211-18, 511.

[32]  Psoriatic plaques are "circumscribed red patches covered by white scales," characterizing chronic skin disease psoriasis.  Merriam-Webster's Medical Dictionary 567 (1995).

[33]  See Tr. 511.

[34]  See Tr. id.  The doctor also listed "TDM" as a diagnosis.  See id. The court is unable to glean from the record what that acronym means.

[35]  See id.

[36]  See Tr. 211-18.

[37]  See Tr. 211.

which joints had the most damage and that those joints were the
ones where Plaintiff had the most pain and was most limited in
movement.[38]

Dr. Banerjee's assessment of Plaintiff's RFC was nearly
identical to that of Dr. Sandknop.[39]  Dr. Banerjee found that
Plaintiff could sit for a total of no more than one hour in an
eight-hour workday, could stand/walk for a total of no more than
one hour in an eight-hour workday, and would need to have the
option of moving around with some frequency as dictated by pain.[40]
Dr. Banerjee opined that Plaintiff could walk only short distances
and could climb only a few stairs.[41]  The doctor further opined that
Plaintiff was incapable of lifting or carrying any weight at all
and was incapable of pulling, pushing, kneeling, bending, and
stooping.[42]

Dr. Banerjee rated Plaintiff's degree of limitation with
regard to grasping, turning, and twisting objects and using her
fingers/hands for fine manipulations as moderate (significantly
limited but not completely precluded) and rated her degree of
limitation with regard to using her arms for reaching as marked

---

[38]    See Tr. 211-12.

[39]    Compare Tr. 213-17 with Tr. 352-56.

[40]    Tr. 214.

[41]    See Tr. 213.

[42]    Tr. 215, 217.

8

(essentially precluded).[43]   According to Dr. Banerjee, Plaintiff needed to avoid dust, heights, temperature extremes, fumes, noise, and gases, was experiencing psychological limitations and limited vision, and could not handle stress.[44]   The doctor concluded that Plaintiff was "not recommended to work" and that "[h]er condition [would] not improve but [would] worsen in time."[45]

Around the time of Plaintiff's first appointment with Dr. Banerjee, Plaintiff also returned to Strawberry Health Center for an annual examination.[46]   At this appointment, her physical examination revealed normal skin condition and blood pressure.[47] In a social narrative note dated to coincide with this appointment, Plaintiff rated her health as a five on a scale from one to ten with ten being the best.[48]   She reported that she did not have any physical limitations and did not need help with daily activities, including cooking, bathing, and transportation.[49]

At her follow-up appointment at the Strawberry Health Center on May 4, 2011, Plaintiff reported she was "doing well" with

---

[43]     Tr. 213.

[44]     Tr. 216, 217.

[45]     Tr. 217.

[46]     See Tr. 530.

[47]     See Tr. id.

[48]     See Tr. 546.

[49]     See Tr. 547.

medication for her psoriatic arthritis.[50]   Furthermore, Plaintiff
reported that medication was controlling her hypertension and
dyslipidemia and that her Continuous Positive Airway Pressure
(CPAP) machine was controlling her sleep apnea.[51]   Although
Plaintiff had a prescription for medication for psoriatic arthritis
from her March 2011 appointment with Dr. Banerjee, she had not
filled the prescription because she lacked insurance.[52]   Plaintiff
denied experiencing medication side effects.[53]

   At Plaintiff's next evaluation on June 30, 2011, Noranna B.
Warner, M.D., ("Dr. Warner") noted psoriatic plaques on Plaintiff's
neck.[54]   Plaintiff assessed her pain level as a two on a ten-point
scale with ten as the worst pain.[55]   She described the pain as
acute, continuous, burning, nagging, and squeezing.[56]   Medication
"ma[de] the pain better," she stated, and walking made it worse.[57]

   Dr. Warner ordered laboratory tests.[58]   X-rays taken that day
revealed no persisting or acute abnormalities of the wrists, hands,

---

[50]   Tr. 519.

[51]   See Tr. 519, 529.

[52]   See Tr. 529.

[53]   See Tr. 519, 529.

[54]   See Tr. 647.

[55]   See Tr. 656.

[56]   See id.

[57]   Id.

[58]   See Tr. 652.

or cervical spine, although the x-ray of the cervical spine revealed mild disc space narrowing and confirmed lumbar spondylosis with degenerative disc disease.[59]

At an August 8, 2011 follow-up, the examination did not reveal evidence of synovitis[60] or psoriasis.[61]  Furthermore, Plaintiff was found to possess full, bilateral range of motion as well as a 5/5 muscle strength in the upper and lower extremities.[62]

   2.   **Psychological History**

On August 3, 2010, Dr. Sandknop completed a Treating Physician Mental Functional Assessment Questionnaire and indicated that Plaintiff was being treated for a mental condition and was responding well to medication.[63]  The doctor did not answer other questions on the questionnaire regarding diagnosis and functional limitations.[64]  The record does not reflect that Dr. Sandknop saw Plaintiff on that day.

The next mention of Plaintiff's mental condition occurred in

---

[59]   See Tr. 559-64.

[60]   Synovitis is an "inflammation of the synovial membrane" ("the dense connective-tissue membrane that secretes synovia," which is "a transparent viscid lubricating fluid secreted by a membrane of an articulation, bursa, or tendon sheath") "usu[ally] with pain and swelling of the joint." Merriam-Webster's Medical Dictionary 683 (1995).

[61]   See Tr. 577, 635-36.

[62]   See Tr. 635-36.

[63]   See Tr. 341.

[64]   See id.

March 2011 during an annual examination.[65]  Shubha P. Shetty, M.D.,
("Dr. Shetty") prescribed Celexa for anxiety and Ambien for
insomnia.[66]  She instructed Plaintiff to schedule a psychiatry
appointment.[67]  Notes from Plaintiff's appointment on May 4, 2011,
indicated "a normal mood and affect."[68]

On June 3, 2011, a resident in the psychiatry department at
the Strawberry Health Center evaluated Plaintiff.[69]  Plaintiff
complained of experiencing depressed mood for five years, citing
various family-related stressors.[70]  Plaintiff indicated that she
was not suicidal or homicidal at the time but had previously
experienced fleeting, passive suicidal ideation with no plan or
intent.[71]  She indicated that she had taken several medications for
depression but found them to be ineffective.[72]  She also reported
experiencing anxiety symptoms for a number of years, but admitted

---

[65]    See Tr. 528-35.

[66]    See Tr. 530.

[67]    See Tr. 530, 531.

[68]    Tr. 520.

[69]    See Tr. 512-19; 657-64.  The record contains two sets of treatment
notes for many of Plaintiff's appointments.  The court notes that, with regard
to the notes from the psychiatric evaluation on June 3, 2011, one set is more
complete.  Compare, e.g., Tr. 512, 514 with Tr. 657-68, 660.  The court relies
on the more complete set.

[70]    See Tr. 657.

[71]    See id.

[72]    See Tr. 513.

that they had improved over the years.[73]  However, she claimed that, in the past year, Celexa seemed less effective against anxiety as she became increasingly depressed.[74]

The resident diagnosed Plaintiff with major depressive disorder, recurrent, general anxiety disorder with panic attacks and determined her global assessment of functioning (GAF) score to be fifty-five.[75]  The treatment plan included increasing the dosage of Celexa to treat depression and anxiety, adjusting other medications, referring Plaintiff for individual therapy, and ordering laboratory tests.[76]

At a follow-up appointment on August 8, 2011, Plaintiff showed marked improvement due to the increased dosage: brighter mood, no panic attacks, and "no untoward side effects of medications."[77]  She bore only moderate symptoms of major depressive disorder at this juncture, and her resulting insomnia was under control through sleeping aides.[78]

**B.   Application to Social Security Administration**

Plaintiff filed for disability insurance benefits and for

---

[73]    See Tr. 658.

[74]    See Tr. 657, 658.

[75]    See Tr. 660.

[76]    See id.

[77]    Tr. 541.

[78]    See Tr. 541-42.

supplemental security income in June 2010, claiming an inability as of June 8, 2010, to work due to: psoriatic arthritis with features of undifferentiated spondyloarthropathy, lumbar type; recurring Epstein-Barr syndrome; chronic iron deficiency anemia; hypertension; and depression.[79]

According to Plaintiff, her daily activities in July 2010 included hanging up laundry, washing dishes, cleaning the house, dusting, cooking small meals, running errands, reading, sewing, watching television, grocery shopping, and other shopping as necessary.[80]   Furthermore, according to Plaintiff's report, she could walk for up to a quarter of a mile, ride in a car, attend church, visit with family and friends, and sometimes go out to eat with others.[81]   However, Plaintiff stated that she required assistance in preparing full meals, performing yard and house work, and completing tasks in or away from the house if they required carrying items.[82]

With regard to her physical abilities, Plaintiff reported that she could not lift more than five pounds for more than a few

---

[79]   See Tr. 31, 132, 134, 149, 153, 168.  Although Plaintiff listed these conditions as limiting her ability to work in a disability report dated June 28, 2011, her attorney provided a slightly different list in September 2011 when appealing the ALJ's decision.  Compare Tr. 153 with Tr. 219.  The attorney listed degenerative disc disease, psoriatic arthritis, anemia, sleep apnea, and obesity. See Tr. 219.

[80]   See Tr. 169-73.

[81]   See id.

[82]   See id.

seconds, stand for long or hold her arms up for very long, bend over or reach above her head, or lift or push anything.[83]  Plaintiff also indicated that depression and anxiety had limited her ability to complete verbal instructions, concentrate on work, and handle stressful situations.[84]

Concerning pain, Plaintiff stated, "It gets worse if I walk or do anything for twenty minutes or so without sitting down."[85]  If she stopped walking, standing, or carrying, Plaintiff explained, the pain would persist for about thirty minutes and then subside.[86] Plaintiff found that Enbrel injections reduced some of the joint pain and that Hydrocodone also helped alleviate the pain.[87]  Because of aching, burning, and dryness in her eyes, Plaintiff stated, she was unable to look at a computer or read for "any length of time."

Yvonne Post, D.O., ("Dr. Post") completed a Physical Residual Functional Capacity Assessment on August 2, 2010.[88]  The assessment reflected that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for at least two hours but typically for four hours consecutively in an eight-hour workday, sitting for about six hours in an eight-hour

---

[83]     See id.

[84]     See id.

[85]     Tr. 177.

[86]     See Tr. 180.

[87]     See Tr. 178.

[88]     See Tr. 333-40.

workday, and pushing or pulling without limitations.[89]  Dr. Post also opined that Plaintiff could frequently climb a ramp or stairs as well as frequently balance, stoop, kneel, crouch, and crawl.[90] No other physical limitations were found, and Dr. Post stated that Plaintiff's alleged limitations were not wholly supported by the medical record.[91]

Plaintiff submitted a supplemental report on August 20, 2010, in which she claimed that her conditions had worsened and her pain was constantly severe.[92]  She reported daily stiffness upon waking as well as pain in her back and arms.[93]  Furthermore, she claimed an increased inability to complete small tasks previously accomplishable, as well as a sense of weakness.[94] At this time, her daily activities were restricted to dusting and jobs that did not require much carrying.[95]  She reported decreased immunity, sleepiness, and nausea as side effects of her medication.[96]

On August 23, 2010, Patty Rowley, M.D., ("Dr. Rowley") completed a second Physical Residual Functional Capacity

---

[89]    See Tr. 334.

[90]    See id.

[91]    See Tr. 336-38.

[92]    See Tr. 187-88.

[93]    See Tr. 187.

[94]    See Tr. 192-93.

[95]    See Tr. 192.

[96]    See Tr. 190-91.

Assessment.[97]   The assessment reflected that Plaintiff was still capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for at least two hours and up to four in an eight-hour workday, sitting for about six hours in an eight-hour workday, and pushing or pulling without limitations.[98] Dr. Rowley also opined that Plaintiff could frequently climb a ramp, stairs, ladder, rope, or scaffolds and could frequently balance, stoop, kneel, crouch, and crawl.[99]   No other physical limitations were found, and Dr. Rowley stated that Plaintiff's alleged limitations were only partially supported by the medical record.[100]   Dr. Rowley found that the treating physician's conclusion that Plaintiff was unable to work was not supported by the physician's treatment notes.[101]   Additionally, Dr. Rowley pointed out that the treating rheumatologist, Dr. Banerjee, confirmed Plaintiff's continued good responses to medications despite the treating physician's findings.[102]

On August 31, 2010, Darrick Wallace ("Mr. Wallace") of the Social Security Administration ("SSA") completed a Report of

_____

[97]    See Tr. 342-49.

[98]    See Tr. 343.

[99]    See Tr. 344.

[100]    See Tr. 345-47.

[101]    See Tr. 348.

[102]    See id.

17

Contact to rule out depression as a disabling impairment.[103]   In
this report, Mr. Wallace stated that, in his interview with
Plaintiff, Plaintiff revealed her activities of daily living
("ADLs") were not as limited as originally claimed in her own
reports.[104]  Plaintiff's physical abilities included handling money,
completing chores, shopping in stores, spending time with others at
church and at home, eating out alone or with friends, preparing
meals, and driving a car.[105]   Furthermore, although Plaintiff
claimed to suffer from depression, Plaintiff appeared to "function
high in regards to her ADLs.  No further development [is] warranted
for mental as there is no more than a minimal [e]ffect in ADLs from
a mental impairment."[106]

Based on the evidence, the SSA denied Plaintiff's application
at both the initial and reconsideration levels.[107]   Plaintiff
requested a hearing before an SSA administrative law judge
("ALJ").[108]  Plaintiff subsequently filed a final disability report
on September 17, 2010.[109]  In the report, Plaintiff stated that her
eyes were getting worse and that she could not look at a computer

---

[103]    See Tr. 195.

[104]    See id.

[105]    See id.

[106]    Id.

[107]    See Tr. 53-73.

[108]    See Tr. 77-78.

[109]    See Tr. 196-204.

for more than fifteen minutes or drive very long.[110]  She also reported that her memory and ability to think clearly seemed to be getting worse.[111]  Her reported medication side effects remained the same as the last disability report.[112]

The ALJ granted Plaintiff's request and conducted the hearing on April 5, 2011.[113]

## C.   <u>Hearing</u>

Plaintiff and Herman Litt ("Mr. Litt"), a vocational expert, testified at the hearing.[114]  Plaintiff testified that she graduated from high school with honors, attended one semester of college and was last employed in June 2010 by Trophy Nissan as an accounting clerk.[115]  At the hearing, she testified that she was living with her husband, her twenty-one-year-old son, his wife, and her sixteen-year-old son.[116] She testified that reasons leading to her unemployment included: an inability to perform required tasks, trouble interacting with other employees, difficulties focusing on projects and concentrating on verbal communication, and reduced

---

[110]    <u>See</u> Tr. 199, 202.

[111]    <u>See</u> Tr. 199.

[112]    <u>See</u> Tr. 200-01.

[113]    <u>See</u> Tr. 10, 24, 80-81, 87-103, 108-09, 114-15.

[114]    <u>See</u> Tr. 24-52.

[115]    <u>See</u> Tr. 30-31.

[116]    <u>See</u> Tr. 43.

productivity speeds.[117]

She identified Dr. Sandknop as her primary care physician who had treated her for high blood pressure, depression, and high cholesterol since 2005 and had referred her to other doctors for more specialized issues.[118] Pursuant to the questions posed by her attorney, Plaintiff stated that she suffered from high blood pressure, psoriatic arthritis, both spondylosis and probably ankylosing spondylitis, and depression.[119] Although she was taking medication for each of these conditions, Plaintiff believed that these conditions, especially the psoriatic arthritis, caused her to experience neck and back pain, feet and ankle numbness, vision impairment, fatigue, and lack of strength, focus, and concentration.[120] Plaintiff claimed that the deterioration caused by the psoriatic arthritis led to stiffness and tingling in various joints in her hands, feet, and ankles from either too much or too little movement.[121] Furthermore, Plaintiff stated the spondylosis led to constant pain in her neck, hips, and back from the continuous need to reposition her body.[122] Additionally, Plaintiff testified that she experienced dryness and irritation of the

---

[117]   See Tr. 42.

[118]   See Tr. 33.

[119]   See Tr. 32-44.

[120]   See id.

[121]   See Tr. 34-37.

[122]   See Tr. 36.

20

eyes.[123]

Plaintiff also testified that these impairments restricted her ability to engage in her normal ADLs.[124]  According to Plaintiff, the pain caused by the dryness and irritation of her eyes impaired her ability to drive, read a book, or view a computer screen for extended periods of time.[125]  Plaintiff stated that the pain attributed to her psoriatic arthritis prevented her from walking, standing, or sitting for more than twenty minutes at a time.[126] Furthermore, Plaintiff testified that the fatigue and lack of strength caused by her psoriatic arthritis prohibited her from carrying more than two to three pounds for more than a short distance and prevented her from completing tasks such as cleaning, personal hygiene, and cooking meals.[127] According to Plaintiff, her lack of concentration and focus also limited her communicative response time and interactions with others.[128]  However, Plaintiff admitted that she was taking medication for most, if not all, of these impairments and largely experiencing positive reactions without negative side effects.[129]  Finally, when questioned by the

---

[123]    See Tr. 37.

[124]    See Tr. 36-44.

[125]    See Tr. 37-38.

[126]    See Tr. 40.

[127]    See Tr. 40, 42-43.

[128]    See Tr. 6, 42.

[129]    See Tr. 33, 35, 38.

ALJ, Plaintiff stated that she had no problems with cardiovascular disease and her cholesterol levels were under control.[130]

Having reviewed the record and heard Plaintiff's testimony, Mr. Litt testified that Plaintiff's most recent work history and experience as a billing clerk constituted semi-skilled work performed at a sedentary level of exertion.[131]  Plaintiff's previous work was designated as follows: (1) work as a finance manager constituted skilled work performed at the sedentary level of exertion and (2) work as a claims clerk constituted semi-skilled work performed at a sedentary level of exertion.[132]

The ALJ then posed a hypothetical question to Mr. Litt asking about the vocational opportunities for an individual of Plaintiff's age and education level relegated to sedentary work, limited to only occasional postural maneuvers (such as balancing, kneeling, stooping, crouching, climbing, and crawling) and prohibited from exposure to dangerous machinery and unprotected heights.[133]  Mr. Litt responded that the hypothetical individual could perform all of Plaintiff's prior work as a billing clerk, finance clerk, and claims clerk.[134]

The ALJ then asked if there were three examples of other jobs

---

[130]     See Tr. 44.

[131]     See Tr. 46.

[132]     See id.

[133]     See Tr. 46.

[134]     See id.

for such an individual, and Mr. Litt responded in the affirmative.[135]   Such an individual would be able to work as an insurance clerk (semi-skilled work and sedentary level of exertion), credit card clerk (semi-skilled work and sedentary level of exertion), or claims clerk (semi-skilled work and sedentary level of exertion), according to Mr. Litt.[136]

The ALJ posed a second hypothetical question in which he added a limitation of performing only simple, routine, and repetitive tasks not performed in a fast-paced production environment and involving only occasional interaction with supervisors, coworkers, and the general public.[137]   Mr. Litt responded that such an individual would not be able to engage in any of Plaintiff's past work and that none of Plaintiff's skills would be transferrable.[138] However, such an individual would be able to perform other jobs including surveillance monitor, order clerk, and sorter; all of these were sedentary, unskilled jobs.[139]   The ALJ then inquired about employer expectations with regard to the number of absences allowed per month, the number of routine break periods allowed per day, and the time allowed per task for the cited jobs, as well as whether exceeding the employer-imposed limits in those areas on a

---

[135]   See id.

[136]   See Tr. 47.

[137]   See id.

[138]   See Tr. 47-48.

[139]   See Tr. 48.

23

regular basis would eliminate, not only the jobs previously discussed, but all competitive employment.[140]   With regard to whether all competitive employment would be eliminated if the hypothetical individual could not meet employer expectations, Mr. Litt responded in the affirmative.[141]

Plaintiff's attorney then inquired as to whether such an individual, further limited to an inability to handle any level of stress, would be able to hold any of the previously discussed positions.[142]  Mr. Litt responded in the negative.[143]

**D.   The Commissioner's Decision**

On May 11, 2011, the ALJ issued an unfavorable decision.[144] The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2012.[145]  The ALJ then followed the five-step process for determining disability that is outlined in the regulations, finding at the first step that Plaintiff had not engaged in substantial gainful activity since June 8, 2010.[146]  At the second step of the process, the ALJ found that Plaintiff had multiple impairments – lumbar degenerative disc disease, psoriatic

---

[140]   See Tr. 48-49.

[141]   See Tr. 49.

[142]   See Tr. 49.

[143]   See id.

[144]   See Tr. 7-23.

[145]   See Tr. 12.

[146]   See Tr. 12.

arthritis, and chronic iron deficiency anemia – that were severe.[147] With respect to Plaintiff's mental impairments, the ALJ provided a detailed analysis of Listing 12.00(C) of the regulations[148] through which the ALJ determined Plaintiff's depression did not cause more than minimal limitation and therefore was not severe.[149]   The ALJ did not continue his discussion of Plaintiff's medically determinable mental impairments into the remaining steps of the sequential evaluation.[150]

At the third step of the analysis, the ALJ determined that Plaintiff's physical impairments, individually or in combination, were not of a severity sufficient to meet or equal any impairment described in the Listings at any point of the alleged disability period.[151]   Regarding Plaintiff's physical impairments, the ALJ specifically considered Listing 1.04 (spinal disorders), Listing 7.02 (chronic anemia), Listing 14.09 (inflammatory arthritis), and Listings 1.00(Q), 3.00(I), and 4.00(F) (all of which discuss obesity).[152]

Having considered the entire record, the ALJ then conducted an assessment of Plaintiff's RFC based on the objective medical record

---

[147]   See Tr. 12-13.

[148]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[149]   See Tr. 13.

[150]   See id.

[151]   See Tr. 14.

[152]   See Tr. 14-16.

and Plaintiff's testimony and conduct at the hearing.[153]   He determined that Plaintiff retained the RFC to perform sedentary work with the following limitations: occasional postural maneuvers (such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, and scaffolds) and no exposure to dangerous machinery and unprotected heights.[154]

Turning to steps four and five, the ALJ considered Mr. Litt's opinion that an individual of Plaintiff's age, education, work experience, and physical RFC would be able to perform Plaintiff's past relevant work as well as the jobs of insurance clerk, credit card clerk, and claims clerk.[155]   Relying on Mr. Litt's opinion and the framework of Rule 201.22 of the SSA's Medical-Vocational Guidelines, the ALJ determined that Plaintiff was capable of performing work existing in significant numbers in the regional and national economies.[156]   The ALJ therefore concluded that Plaintiff was not disabled under the Act at any point.[157]

Plaintiff appealed the ALJ's decision and submitted additional evidence.[158]   The Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final

---

[153]   <u>See</u> Tr. 16-19.

[154]   <u>See</u> Tr. 16.

[155]   <u>See</u> Tr. 17-19.

[156]   <u>See</u> Tr. 19, 57-58.

[157]   <u>See</u> Tr. 19.

[158]   <u>See</u> Tr. 1-5, 118.

decision of the Commissioner.[159]   Plaintiff then sought timely judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying the disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991)(citing Cook v. Heckler, 750 F.2d 391, 393 (5th Cir. 1985)).   Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

---

[159]   See Tr. 1-3, 68-73, 117-19.

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir, 1994); see also 20 C.F.R. §§ 404.1520, 416.920. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236 (citing Lovelace v. Bowen, 813 F.3d 55, 58 (5th Cir. 1987)).

## B. Substantial Evidence

The widely accepted definition of "substantial evidence" is

"that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." Id.   The Commissioner bears the duty of determining any evidentiary conflict.  Id.   If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, the findings are conclusive, and this court must affirm.   42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v Apfel, 192 F.3d 492, 496 (5th Cir. 1999).   Therefore, the court is to give the Commissioner's decision as much deference as possible without making its review meaningless.   Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.

Specifically, Plaintiff argues that: (1) the ALJ failed to follow the "Treating Physician Rule;" (2) the ALJ failed to properly evaluate Plaintiff's credibility; and (3) the Appeals Council failed to properly consider new evidence from Plaintiff's rheumatologist. Defendant argues that the decision is legally sound and is supported by substantial evidence. The court considers the merits of the arguments in turn.

**A.    "Treating Physician Rule"**

The "Treating Physician Rule," to which Plaintiff refers, states that "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(quoting Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1990))(internal quotation marks omitted); see also SSR 96-2p, 1996 WL 374188, at **4-5 (S.S.A. July 2, 1996) (explaining when medical opinions by treating physicians are entitled to controlling weight); 20 C.F.R. § 404.1527(c)(same), 20 C.F.R. § 416.927(c)(same). However, an ALJ ultimately may give less weight to the medical opinion of any physician when the statements are conclusory, unsupported, or otherwise incredible. Newton, 209 F.3d at 455-56. Additionally, any physician's opinion on issues reserved to the Commissioner, such as the plaintiff's disability

status and the plaintiff's RFC, is not given any special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d); <u>see also</u> SSR 96-5p, 1996 WL 374183, at *1 (S.S.A. 1996).

If an ALJ decides not to afford the treating physician's opinion controlling weight, he must consider the following factors in deciding how much weight to give the opinion:  the nature of the relationship between the plaintiff and the physician; the medical evidence supporting the physician's opinion; the consistency of the physician's opinion with the record as a whole; the physician's specialization; and any other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c). Based on those factors, an ALJ must provide "appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. 1996); <u>see also</u> 20 C.F.R. § 404.1527(c)(2)("[The SSA] will always give good reasons in our notice of determination or decision for the weight [the SSA] give[s] your treating source's opinion.")

In the present case, the ALJ decided that Dr. Sandknop's opinion finding Plaintiff incapable of performing sedentary work was not supported by objective findings and, thus, was not entitled to controlling weight.[160]  The remainder of the ALJ's discussion of Dr. Sandknop's opinion is a string of legal statements plucked from

---

[160]    <u>See</u> Tr. 17.

various cases.[161]   These statements cover the treatment of conclusory opinions, subjective complaints, and objective medical evidence.[162]   Although accurate statements of the law, the discussion is completely devoid of application to this case.   In other words, the ALJ failed to identify portions of the record that support his decision to give lesser weight to Dr. Sandknop's opinion.  The only reason given is that Dr. Sandknop's opinion was not supported by objective findings.

In certain cases, that reason may be enough to satisfy the requirement that the ALJ provide appropriate explanation for giving a treating physician's opinion less weight.  But, here, the ALJ's reason is not fully consistent with the record.   In the MIQ completed in October 2010, Dr. Sandknop listed multiple positive clinical findings and laboratory and diagnostic test results that supported his diagnosis.  The ALJ neither explained why he found the cited objective medical evidence to be insufficient to support Dr. Sandknop's diagnosis or RFC opinion nor cited the contrary medical evidence on which the ALJ's decision was based.[163]

---

[161]   See id.

[162]   See id.

[163]   The court acknowledges that, in determining what weight to give a treating physician's opinion if less than controlling, the ALJ must consider the regulatory factors (nature of relationship, supportability, consistency, specialization, and other factors).  See 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations require only that the ALJ *consider* the factors, not that the ALJ include a factor-by-factor analysis in his opinion.   See 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ's decision specifically referenced one of the factors, supportability.  The court has no reason to assume that the ALJ did not consider the other relevant factors.

The ALJ's failure to provide good reasons for the weight he
afforded Dr. Sandknop's opinion, however, did not lead to an
incorrect decision.  Dr. Sandknop's assessment of Plaintiff's RFC,
the aspect of his opinion Plaintiff asserts should have been given
controlling weight, was not entitled to controlling weight in the
first place.  See 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p,
1996 WL 374183, at *1 (S.S.A. 1996).  RFC is one of the issues
reserved to the Commissioner, and, thus, the doctor's opinion on
RFC is not entitled to any special significance.[164]  20 C.F.R. §§
404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183, at *1 (S.S.A.
1996).

Although Dr. Sandknop had treated Plaintiff for several years
prior to the alleged onset date, his contact with Plaintiff during
the relevant period primarily consisted of completing
questionnaires and providing information about her disability
status.  He wrote the letter opining that Plaintiff was unable to
work on the day of the alleged onset of disability.  Two months
later, he completed a questionnaire about Plaintiff's mental
abilities, and, nearly three months after that, he completed the
MIQ in which he provided an opinion about Plaintiff's physical RFC.
Curiously, he opined, in the MIQ, that the description given of
Plaintiff's symptoms and limitations applied since March 2005, five

---

[164]    Also not entitled to any special significance was Dr. Sandknop's
opinion, expressed in a letter dated June 8, 2010, that Plaintiff was "unable to
work at this time."  See Tr. 332; 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-
5p, 1996 WL 374183, at *1 (S.S.A. 1996).

years prior to the date on which she stopped working and claimed disability.

The only other contacts with Dr. Sandknop evidenced by the record during the relevant period are laboratory results from specimens collected on October 27, 2010, and one treatment note from an appointment on December 27, 2010. Neither the laboratory results nor the treatment note suggested that Plaintiff's condition was such that she was unable to work. In fact, the treatment note indicated that she was doing well.

With regard to the battery of clinical and diagnostic tests that Dr. Sandknop listed in the MIQ, they were provided specifically as support for his *diagnoses* of Plaintiff.[165] He did not explain how the results of those tests supported the highly restrictive RFC he attributed to Plaintiff. Moreover, his assessment of Plaintiff's RFC, which included up to one hour of sitting and up to one hour of standing/walking in an eight-hour workday with no lifting or carrying of any weight at all and no pushing, pulling, kneeling, bending, or stooping, was contrary to substantial evidence in the record, including Plaintiff's own testimony regarding her abilities.

For example, in July 2010, Plaintiff's daily activities included hanging up laundry, washing dishes, cleaning the house,

---

[165]    See Tr. 350 (answering question asking for clinical findings that support the diagnosis); Tr. 351 (answering question asking for laboratory and diagnostic test results that support the diagnosis).

dusting, cooking small meals, running errands, reading, sewing, watching television, grocery shopping, and other shopping as necessary. At that time, she could walk for up to a quarter of a mile, ride in a car, attend church, visit with family and friends, and sometimes go out to eat with others. Moreover, in March 2011, Plaintiff reported to treatment providers at Strawberry Health Center that she did not have any physical limitations and did not need help with cooking, bathing, transportation, and other ADLs.

The court finds that the ALJ's decision with regard to the weight given to Dr. Sandknop's opinion complies with the law and is supported by substantial evidence.

## B.  **The ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff next argues that the ALJ erred in discounting her credibility, particularly with regard to medication side effects and daily activities. Plaintiff further claims that the ALJ utilized "boilerplate language,"[166] which turned the legal standard on its head.

Though pain can constitute a disabling impairment, "the mere existence of pain is not an automatic ground for obtaining disability benefits." <u>Fortenberry v. Harris</u>, 612 F.2d 947, 950 (5th Cir. 1980). Once a medical impairment is established, "pain constitutes a disabling condition . . . only when 'it is constant, unremitting, and wholly unresponsive to therapeutic treatment.'"

---

[166]    <u>See</u> Doc. 11, Pl.'s Mot. For Summ. J., 13-14.

Beck v. Barnhart, 205 F. App'x 207, 212 (5th Cir. 2006)(unpublished) (citing Cook, 750 F.2d at 395). The ALJ must consider subjective evidence of non-exertional ailments that may have a disabling effect, such as pain, along with other record evidence; however, only if the ALJ finds the claimant's testimony credible based on the entire record must the ALJ fully credit her assertions of pain without supporting medical evidence. Beck, 205 F. App'x at 212; see generally 20 C.F.R. §§ 404.1520, 416.920.

It is ultimately the responsibility of the ALJ to make the determination of whether the pain is debilitating. Wren, 925 F.2d 128. Therefore, the ALJ's conclusions regarding the disabling effect of the subjective complaints, such as pain, "are entitled to considerable judicial deference." James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986).

Here, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.[167]

The ALJ indicated that Plaintiff never complained of side effects to her physicians and that her reported activities were not consistent with a claim of total disability. He also noted that impairments which are controlled by medication or treatment cannot

---

[167]    Tr. 17.

support a finding of disability.

The court begins with Plaintiff's complaint regarding the ALJ's use of boilerplate language.  The court does not understand the offending language (that the limiting effects of Plaintiff's symptoms were not credible to the extent they were inconsistent with the ALJ's RFC) to indicate that the ALJ first determined Plaintiff's RFC and then discredited Plaintiff's testimony because it did not agree with his assessment.  Rather, it seems that the language is a shorthand way of indicating what aspects of Plaintiff's testimony that the ALJ finds to be less credible. Regardless, whether the ALJ employed boilerplate language in his decision is simply not relevant to the court's review.  The issue here is whether the determination reflected in the language is legally correct and supported by substantial record evidence with regard to this particular Plaintiff.

Concerning side effects, Plaintiff did not report side effects to her treatment providers during the relevant period and, in fact, routinely denied experiencing any.[168]  Plaintiff points to two questionnaires, one completed by Dr. Sandknop and one completed by Dr. Banerjee, in which the doctors list side effects that Plaintiff reported to them.  However, the doctors' treatment notes do not reflect that Plaintiff ever reported any side effect at her medical appointments.  Plaintiff not only failed to report side effects

---

[168]  See, e.g., Tr. 358, 519, 529, 541, 665.

during medical appointments, on at least two occasions she affirmatively stated that the medications helped.[169]

Plaintiff's only specific mention of side effects was contained in the SSA application paperwork.[170]  There is no medical record evidence of Plaintiff's complaining of side effects to her treating physicians.  Without such support, Plaintiff's arguments are unsubstantiated, and the court finds that the ALJ did not err in his findings.

Concerning Plaintiff's daily activities, the record shows that, after the alleged onset date, Plaintiff engaged in household activities such as hanging up laundry, washing dishes, dusting, cleaning house, cooking small meals, and using small appliances. Plaintiff also engaged in leisure activities within the household such as reading, sewing, and watching television.  Furthermore, the records show that Plaintiff conducted business outside of the household after the alleged onset date (such as running errands and shopping) and engaged in social activities (such as driving, shopping, visiting friends, going out to eat, and attending church).[171]  This evidence supports the ALJ's RFC findings that Plaintiff could perform a limited range of sedentary work activities.

---

[169]   See Tr. 656, 665.

[170]   See Tr. 190-91, 200-01.

[171]   See Tr. 169-73.

**C.   New Evidence**

Plaintiff argues that the Appeals Council failed to properly consider new and material evidence, specifically the detailed questionnaire from Plaintiff's treating rheumatologist.

The Appeals Council is required to "evaluate the entire record including the new and material evidence submitted." Higginbotham v. Barnhart, 405 F.3d 332, 337 (5th Cir. 2005)(internal alterations omitted)(quoting 20 C.F.R. § 404.970(b)).  The Appeals Council is to consider "the additional evidence only where it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b).  Although all new and material evidence must be considered, it need not be discussed in detail. See Higginbotham, 405 F.3d at 335 n.1.

In its Notice of Appeals Council Action, the Appeals Council indicated that it considered the additional evidence that was listed in its Order of Appeals Council.[172]  In the order, the Appeals Council did not include Dr. Banerjee's questionnaire in the list of exhibits considered as additional evidence, even though it was submitted in July 2011, prior to the Appeals Council's decision.[173]

At first blush, something appears to be amiss.  However, the questionnaire was completed on July 22, 2011, more than two months

---

[172]    See Tr. 1.

[173]    See Tr. 5.

after the date of the ALJ's decision.[174]   Although the Appeals
Council did not specifically mention that it considered the
questionnaire, it indicated that it did consider the treatment note
from the only appointment that Plaintiff had with Dr. Banerjee
during the relevant time period.[175]  Perhaps more importantly, Dr.
Banerjee's opinions in the questionnaire concern Plaintiff's RFC
and ability to work, neither of which would be binding on the
Commissioner.  See Martinez v. Astrue, 252 F. App'x 585, 587 (5th
Cir. 2007)(unpublished)(stating that evidence is not probative when
it offers physician opinion on disability under workers'
compensation system); see also 20 C.F.R. §§ 404.1527(d)(opinions on
RFC and disability status are not given any special significance),
416.927(d)(same).

Accordingly, the court finds that Dr. Banerjee's questionnaire
was not material to the Commissioner's determination whether
Plaintiff was disabled at any point during the period June 8, 2010,
and May 11, 2011.  Because the questionnaire was not material, the
Appeals Council was not required to consider it.  See 20 C.F.R. §§
404.970(b), 416.1470(b).  The court further finds that the
information in the questionnaire would not provide any reason to

---

[174]    See Tr. 218.

[175]    See Tr. 5, 511.  Dr. Banerjee's note of March 2011 stated that
Plaintiff had not been seen in nearly a year, and the questionnaire, dated July
22, 2011, listed the March 2011 appointment as the most recent appointment.  See
Tr. 218, 511.

reverse the ALJ's decision, which was supported by substantial evidence as explained above.

### IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff'S Motion for Summary Judgement and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 23rd  day of July, 2013.

_____
Nancy K. Johnson
United States Magistrate Judge